EDWARD J. STEPPANSKI et al., complainants-respondents,

*v.*

JESSE L. SCULTHORP, defendant-appellant.

[Submitted May 29th, 1931. Decided October 19th, 1931.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Bigelow, who filed the following opinion:

"This bill seeks to rescind for alleged fraud an agreement between the parties and to recover from the defendant large sums paid him pursuant thereto. The defendant, Jesse L. Sculthorp, prior to 1925, had been engaged in the real estate business in this state for many years. In that year he like many others began to speculate in Florida real estate and thereafter for two or three years spent the greater part of his time in that state. In the latter part of May and in June, 1925, Sculthorp contracted to purchase three tracts of land, at Delray, Florida, for $67,000, of which $30,500 was payable in cash and $36,500 was to be secured by mortgages. Two of these parcels were conveyed to him in June and the third on September 8th, 1925, and the cash consideration was duly paid by him and the purchase-money mortgages executed. On August 26th, 1925, Sculthorp, his son, Stanley F. Sculthorp, and the complainants, Edward J. Steppanski and John E. Jones, executed in New Jersey a certificate of incorporation under the laws of Florida for the purpose of incorporating Sculthorp Realty Company, Incorporated. This certificate was filed in the secretary of state's office in Florida on September 3d, 1925. On November 5th, 1925, Sculthorp and his wife conveyed to the corporation the three parcels of real estate subject to the mortgages, and by the terms of the deed the corporation assumed payment of the same as part of the purchase price. No other consideration was paid by the corporation except the issuance of stock mentioned below.

"The authorized capital stock of the company was $75,000, divided into seventy hundred and fifty shares of the par value of $100 each. By the certificate of incorporation Mr. Sculthorp subscribed to five hundred shares, his son fifty shares and Steppanski and Jones one hundred shares each. Certificates for all of this stock were issued when the certificate of incorporation was signed on August 26th. No consideration for the stock was paid to the company except the conveyance of the land.

"Steppanski, in 1925, carried on a plumbing business in Jersey City where his wife ran a steam laundry; they also

had a small summer hotel at Keansburg. Jones lived in Keansburg and was a salesman and manager of a coal company with an office in New York. They, like Sculthorp, had become enamored with the thought of easy money to be gained in the Florida boom. They testified to this story.

"In the early part of May, 1925, Sculthorp told them he was going back to Florida soon to buy some land and suggested that Steppanski and Jones each entrust him with $5,000 for this purpose and that he would put up the balance which might be required; that they would form a corporation to take title to the land and in which their several investments would be represented by stock. They agreed to the proposition and said they would have the money ready whenever he needed it. With this understanding Sculthorp left for Florida on May 25th. On June 10th, Stanley Sculthorp told them that he had received a telegram from his father to the effect that he had selected some choice property which required more money than he anticipated and his father wanted to know whether Steppanski and Jones would each increase his investment to $10,000. Both of them agreed to do so. Sculthorp returned from Florida the end of June. He told them he had an option on three tracts of land for a total purchase price of $100,000, but that he had agents working on the property and hoped to obtain the land at a lower figure. August 21st, Sculthorp told Steppanski and Jones that he had bought the property for $100,000 and had to have their contributions immediately. Steppanski and Jones then each gave him a check for $5,000. In October, the three of them went to Florida and inspected the land. Steppanski paid Sculthorp $5,000 more on October 21st and Jones gave him $2,000 on October 26th. They returned to New Jersey early in November.

"The company was not successful in selling lots. The boom began to crumble and trouble developed between the parties to this controversy. Jones found difficulty in raising his remaining $3,000. He and Steppanski went to Florida in January, 1927, where they joined Sculthorp. Steppanski and Jones then consulted a Florida attorney who examined

the records of the deeds to Sculthorp and noticed that the revenue stamps indicated that the purchase price was but $67,000. This, according to their testimony, was their first intimation that the purchase price was not $100,000.

"Sculthorp's version of the affair is entirely different. According to him the subject of a joint enterprise in Florida was never broached until he returned to Keansburg the end of June, 1925, after purchasing the premises in question. He told Steppanski and Jones that he had purchased property in Florida and had been offered a $15,000 profit on it. He did not mention the purchase price and they did not ask it. They did ask, however, to be allowed an interest in the land and eventually and reluctantly he agreed to turn over his land to the corporation to be formed for $100,000, taking his profit in stock and to allow Steppanski and Jones each to subscribe for $10,000 in stock at par. This plan was carried out and the property transferred accordingly to the corporation.

"There are a number of details which lead me to the belief that complainants' version is the true one. The time when Steppanski and Jones first agreed to embark on the speculation with Sculthorp is important. If the agreement was made before Sculthorp purchased the land it would indicate that he was acting as their agent and would contradict his testimony that when the agreement was made he disclosed that he had already purchased the land. All parties agree that Sculthorp left for Florida May 25th, 1925. Steppanski says when he agreed to go into the enterprise to the extent of $5,000, Sculthorp told him that he would wire whenever he needed the money. So Steppanski on May 28th, when leaving Jersey City for Keansburg for the week-end, took with him a blank check on the bank in Jersey City where he had his account. After he arrived in Keansburg he signed this check in blank and gave it to his wife with instructions to put it in the safe and hold it until she received word from Stanley Sculthorp as to how much his father wanted and then to fill in the amount, but not exceeding $5,000. He further testified that this check remained in the safe until

August when he took it out, filled in the amount and Sculthorp's name and handed it to Sculthorp. This testimony is supported by his wife and his mother. In further support of it he produced his canceled checks and his check book. The check in question is number 2711. The checks bearing smaller numbers are dated May 26th, 1925, or earlier; check 2712 is marked void; check 2713, and subsequent checks, are dated on or after June 6th. The numbers on the checks are printed in regular sequence. Of course, it is possible that checks 2711 and 2712 were taken from the check book at the end of May without reference to any deal with the defendant, and that check 2711 being ready at hand in August, was filled in and given to Sculthorp, but it would be a rare coincidence that this happening should fit so pat with complainants' case. Jones and his wife also testified that their agreement with Sculthorp was made in May.

"Sculthorp testified that a meeting of the stockholders was held in Florida at the office of his attorney there on October 27th, 1925. He produces minutes of this meeting which set forth in full the transaction according to his version. These minutes are signed by himself and by his son, Stanley. Stanley testified, however, that he was never in Florida; that the minutes of that particular meeting were retained in Florida by his father until February, 1927, when they were brought to Keansburg and signed by Stanley. Stanley, therefore, cannot corroborate his father as to this meeting. The complainants deny that any such meeting was held and deny that they ever saw the minutes of the purported meeting until after this suit was brought. Mr. Sculthorp testified that the minutes were read and approved at the meeting itself. They contain this significant statement: that Steppanski and Jones each paid in $5,000 on account of their subscription to the company's stock and made satisfactory arrangements for the payment of the balance. As a matter of fact, Steppanski had paid his second $5,000 on October 21st, and Jones in addition to his first $5,000 had paid $2,000, October 26th. Sculthorp, as I understand his testimony, explains this discrepancy between the minutes and the admitted facts

on the ground that several days before the meeting was held he had given his attorney the data from which the minutes were drawn and that when the meeting was held the minutes already typed were read and approved. Gullible and unbusinesslike as these parties have proved themselves to be, I cannot doubt but that complainants would have insisted on a correction of the minutes if they had actually been read. I do not believe this meeting ever took place.

"In January, 1927, when complainants' Florida attorney, Mr. Falls, had examined the records of the deeds, he, with Steppanski and Jones, called on Sculthorp. Mr. Falls asked Sculthorp to explain the discrepancy between the purchase price of $67,000 indicated by the revenue stamps, and Sculthorp's statement that he had paid $100,000 for the land. If Sculthorp's conscience was clear he would have readily answered that $67,000 was what the lands cost him and $100,000 was the price at which he sold it to the corporation, but his actual answer, according to his own testimony, was this: 'Mr. Falls, I don't believe you have any right to question me about this matter unless my attorney is present.'

"There was another feature of the matter, the exact pertinence of which I do not grasp. On October 18th, 1926, Sculthorp, as president of the company, and his son, Stanley, as secretary, executed a conveyance of the lands to Sculthorp. The conveyance purports to be acknowledged in Florida before a notary public four days after the date of the deed. The certificate of acknowledgment by Stanley Sculthorp is false; at least, he testified that he never was in Florida. This conveyance was made without the knowledge of the complainants. As soon as their attorney on examining the record found it out, Sculthorp offered to convey the property back. He was asked both then and on cross-examination why he had executed the deed to himself and he answered that it was made for 'some legal reason, my attorney advised me; I don't know just why.'

"Reverting to the spring of 1925, complainants testified that Stanley Sculthorp told them he had received a telegram from his father asking if they would put in $10,000 each

instead of $5,000. On cross-examination he was asked, 'did you say, ' "I received a wire from pop; he has a choice piece of real estate in view but it will require more money than he anticipated and pop wants to know if you can increase your investment from $5,000 to $10,000?' " Answer: 'I do not recall.' Later he was again asked, 'did you receive such a wire from your father?' Answer: 'Not to my knowledge.' 'You don't recall?' Answer: 'No.' On redirect examination he was asked, 'you have answered several questions by saying ' "I do not recall;" what do you mean by saying you do not recall?' The witness did not answer. After several more questions he was then asked whether he had received such a telegram from his father and he replied in the negative. I get the impression from this testimony that Stanley Sculthorp was endeavoring to avoid admitting the receipt of the telegram, but that he was reluctant flatly to deny its receipt.

"Defendant could have obtained disinterested testimony which would have been almost conclusive if he had taken the deposition of his Florida attorney, who he says was present at the meeting of October 27th, 1925. His failure to take this testimony tells heavily against him.

"Defendant makes the point that the capital of the corporation, $75,000, contradicts the claim of the complainants that they thought the property had been purchased by Sculthorp for $100,000. This is so; but the capitalization also does not fit with defendant's admission that the property was conveyed to the corporation for $100,000. The equity to be represented by stock in either case was $63,500, since the mortgages were assumed by the corporation.

"Sculthorp testified that the complainants never inquired of him what he paid for the land or what profit he was making on his sale to the corporation. It is rather difficult to believe that Steppanski and Jones would have not been curious on that point.

"Defendant raises only one legal question. He points out that complainants inspected the land in October, 1925, before they made the second payments and were then offered the

opportunity to withdraw from the enterprise and receive back what they had invested; that they both expressed themselves satisfied with the land and thought it was worth $100,000 and refused to withdraw. This is unimportant. The fraud on which this suit is based is not concerned in the quality of the land or its value. The fraud consisted of the misrepresentation by Sculthorp as to the price he had paid for the land while acting as agent for all the parties. There should be a decree pursuant to the prayer of the bill."

*Messrs. Quinn, Parsons & Doremus,* for the appellant.

*Messrs. Eichmann & Seiden,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons given in the opinion filed by Vice-Chancellor Bigelow.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DALY, DONGES, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 14.

*For reversal*—None.